DAISY L. THOMAS, BESSIE WHITTINGTON, ANNA BROWNING WEBB, AND AL WOOTERS v. ERIE SUMMERS, LAKE MAY, JOHN HOLT, OLLIE DICK, AS GUARDIAN OF LUCY DICK AND FRED DICK, INFANTS; FRED DICK, AND LUCY DICK.

(Filed 24 January, 1925.)

**Wills—"Home Place"—Evidence de hors.**

In construing a devise of testatrix's home on a designated street of a city, it is competent to introduce evidence *de hors* the description in the devise to fit the place to the description, as in this case, where there were two adjoining lots, it was competent to show by parol that the testatrix had instructed that a fence be put around them both, and that in her payment of taxes and otherwise she regarded the adjoining vacant lot as a part of the home place in which she had resided.

APPEAL by plaintiff from *Lane, J.,* and a jury, at June Term, 1924, of GUILFORD.

This was a special proceeding, brought by the plaintiffs against the defendants, in which they allege that they and the defendants are tenants in common of certain land, described in the petition as lot No. 5. The defendant Erie Summers sets up the plea of "sole seizin."

The following issue, and answer thereto, was submitted to the jury: "Are the plaintiffs and defendants tenants in common of lot No. 5, as set out in the complaint? Answer: 'No.'"

Judgment was rendered in accordance with the verdict. The plaintiff assigned numerous errors, and appealed to the Supreme Court.

*R. C. Strudwick for plaintiff.*
*Wilson & Frazier for defendant.*

CLARKSON, J. The sole question involved in this case is the construction of the will of Emma Buchanan Clymer. Under section 6 she wills and devises "to my niece, Erie Summers, my home place on McIver Street." The will was dated 26 November, 1919. Her husband died in 1920, and the testatrix died in 1922. Her will made provision for her husband, who died before she did.

The evidence introduced showed that Mrs. Clymer had purchased three lots on McIver Street—lots Nos. 4, 5, and 6 in the subdivision of Greensboro known as Lenora; No. 6 being purchased on 2 July, 1912, and later sold by her to J. H. Buchanan; No. 4 being purchased on 29 October, 1915, and No. 5 on 19 November, 1915. Lots 4 and 5 adjoin each other and are on McIver Street, and the residence is on lot 4. Lot 5 adjoins this residence lot on the south. Lot 6, she sold, was adjoining lot 5, further south. Mr. Buchanan's home was south

of lot 6, that he purchased. There were no buildings on lot No. 5. The residence was on lot 4. It had a 50-foot frontage, with an alley on north side. Mrs. Clymer, the testatrix, planted flowers on lots 4, 5, and 6, and had it beautified with a flower garden. The flower garden extended along the front of lot 4, the residence lot, and lots 5 and 6. She had the front lots filled up, level, back as far as the building line of Buchanan home lot, which was south of lot 6. When Mr. Buchanan bought lot 6, she moved the fence and put it between lots 5 and 6. She had fruit trees and grape vines on lot 5. Her husband, who died before testatrix, planted rye on lot 5 and put chicken-wire across the lot, and the rye patch was for the chickens. She rented the residence lot, No. 4, to Mr. Lucas, about a year before she died. She did not rent lot 5 to Mr. Lucas.

The following question was asked the witness, R. T. Thomas, by defendant; objection was made by plaintiff to question and answer, and exception and assignment of error taken:

"Q. Before her death, didn't testatrix tell you, as looking after her business, to place around both of those lots an iron fence embracing the whole? Answer: 'She did.'

"Q. You didn't do so? Answer: 'No, sir. She told me to embrace the whole with an iron fence. I don't know that thereafter she asked me to go to Mr. Lucas and ask him if he had any objection to embracing it all in the iron fence.' "

The witness, Thomas, further said: "I can't say how many times she spoke to me about the fence. She asked me probably three or four times about it—if it had been put up. I told her I could not get the material. I went to see the hardware men about buying material to put up that fence across the front of the two lots—the one the house was on, and the other one."

It was shown that prior to 1920 the lots were listed separately, but under the Revaluation Act the returns or sheets showed 100 x 150 feet, on which there is a house, and all valued together, and the land returned as one lot was signed by Mrs. Emma B. Clymer, the testatrix.

J. H. Buchanan, a nephew, by marriage, of testatrix, who lived on lot south of lot 6, and who purchased from testatrix lot 6, said: "I attempted to buy the other lot." The following question and answer was duly objected to, and exception taken and assignment of error made:

"Q. Did she say anything to you about your buying the other lot? Answer: 'After Uncle Joe died, I said to her she would not need the vacant lot, and I would like to buy it. She said, "No; that belongs to my home place." ' "

He further testified: "I am familiar with the premises there. After she acquired the house and lot and the other lot next to it, she used the two lots as one lot, so far as that is concerned, in planting flowers and shrubbery or garden—used it as a chicken-yard or anything of that kind. It was used as one lot. She made no discrimination in the two lots, so far as I have been able to see or know. She used the lot her house was on, and the one next to it, as her flower garden—the front side—and as a garden, orchard and chicken-yard and grape vines—all of the lot the house was on, and the one next to it. Both lots, flowers went across the other one as one yard. There are rose bushes, ever-greens and magnolia tree on the vacant lot. There are some peach trees, grape vines, plum trees and damson trees—such as that—I don't know just definitely. . . . I heard Aunt Emma say that she told Mr. Thomas to put up the iron fence around the lots—that is all I know—around her lots or premises."

S. C. Summers testified to a conversation with testatrix, to which objection and exception was taken to question and answer, and assignment of error was duly made as to the request he heard the testatrix make to R. T. Thomas that he put an iron fence around lots 4 and 5. "He came to see her, and she asked him had he put up that wire fence, and he said no, he hadn't put it up, and he said he never got the stuff to put it up. She says, 'I want you to put it up; I want you to put it from Jim Buchanan's line to the Reitzel line, clear across my lot'; and she was after him, time and time again, to put that fence up. I heard her say this to him several times."

The plaintiff contends that the evidence to which assignments of error were made was incompetent, that the words of the will were not ambiguous, there was no ambiguity, either latent or patent. We cannot so hold. We think the court below made no error in admitting parol testimony to fit the description to the land intended to be conveyed, to identify the land, "my home place on McIver Street."

*Pearson, J.,* in *Institute v. Norwood,* 45 N. C., p. 68, so well states this matter that we reproduce it:

"There are two principles settled and, in fact, admitted, on all hands: 1. If there be a *patent* ambiguity in an instrument, the instrument must speak for itself, and evidence *dehors* cannot be resorted to. 2. In cases of *latent* ambiguity, evidence *dehors* is not only competent, but *necessary.* The difficulty grows out of the application of these two principles, so as to say when a particular case falls under the operation of the one or the other. To remove this difficulty, it is necessary to go to the fountain, and trace these two streams down, and thereby avoid confounding them; for, although they run close together, there is a plain, marked line between them, which has but seldom been crossed.

The fountain of the first, in the rule as to *patent* ambiguity, is, that it is a *question of construction.* Hence, the instrument must speak for itself, and in case of doubt, no evidence *outside* can be called in aid; for the only purpose of construction is to find out *what the instrument means,* and that must depend upon *what the instrument says.* The fountain of the second, in the rule as to *latent* ambiguity, is, that it is a *question* of identity—a fitting of the description to the person or thing, which can only be done by evidence outside or *dehors* the instrument; for how can any instrument identify a person or thing? It can describe, but the identification, the fitting of the description, can only be done by evidence *dehors.*" *Sherrod v. Battle,* 154 N. C., 352; *Green v. Harshaw,* 187 N. C., 221; *Kidder v. Bailey, ibid.,* 505.

*Allen, J.,* in *Fulwood v. Fulwood,* 161 N. C., p. 602, says: "The description of land devised to the defendant as 'the homestead tract' presented the case of a latent ambiguity, as it was uncertain, what land was intended to be included under that designation, after it appeared that the 200-acre tract and the first, second and third tracts described in the petition were adjoining tracts, and that the lands were acquired under different descriptions and at different times. *Sherrod v. Battle,* 154 N. C., p. 353. It was then permissible to introduce extrinsic evidence to fit the description, and for that purpose the declarations of the testator at the time of making the will and at other times, and his manner and dealing with the land, as by listing for taxation as one tract, were competent evidence. *Kincaid v. Lowe,* 62 N. C., 42; *McLeod v. Jones,* 159 N. C., 76."

We think the evidence objected to by plaintiff competent. The question as to the identity of the land "my home place on McIver Street" was a question of fact for the jury to fit the description to the land intended to be conveyed.

From a careful review of the case, we can find

No error.